# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

| | | |
|---|---|---|
| E.H., a minor, by and through his parent, CONSTANCE HILDEBRAND, | : : : | |
| R.S., a minor, by and through his parents, KIMBERLY SARGENT and ROBERT SARGENT, | : : : : | **CASE NO.:  1:14-CV-694**<br><br>**COMPLAINT FOR TEMPORARY RESTRAINING ORDER, INJUNCTIVE** |
| T.H., a minor, by and through his parent, TERESSA HEATH, and | : : : | **RELIEF, DECLARATORY RELIEF, AND DAMAGES** |
| W.P., a minor, by and through his parents MICHAEL PACKNETT and JACQUEL DEAN, | : : : : | **JURY TRIAL DEMANDED** |
| PLAINTIFFS,<br>-vs- | : : : | |
| NORTHWEST LOCAL SCHOOL DISTRICT; | : : : | |
| NORTHWEST LOCAL SCHOOL DISTRICT BOARD OF EDUCATION, | : : | |
| ANDREW JACKSON, | : : | |
| PAULETTA CROWLEY, | : : | |
| MAUREEN HEINTZ, | : : | |
| GEORGE STURGEON, | : : | |
| JOE BERTRAM, | : : | |
| ROBERT REYNOLDS, | : : | |
| DAN BOLDEN, | : : | |
| MATTHEW STOINOFF, | : : | |
| COLERAIN TOWNSHIP BOARD OF TRUSTEES, | : : : | |

1

JEFF RITTER,                                          :
TRUSTEE OF COLERAIN TOWNSHIP,        :
                                                            :
MELINDA RINEHART                               :
TRUSTEE OF COLERAIN TOWNSHIP,        :
                                                            :
DENNIS DETERS                                      :
TRUSTEE OF COLERAIN TOWNSHIP,        :
                                                            :
MARK DENNEY,                                      :
                                                            :
OFFICER ASHLEY MEYER, and               :
                                                            :
OFFICERS DOE, 1-9,                                :

DEFENDANTS.

## COMPLAINT

## PRELIMINARY STATEMENT

1.      It is not a crime to be an African-American teenager.  Yet, on April 10, 2014, Colerain High School administrators in coordination with Colerain Township police officers acted as if it were when they rounded up African-American students, held them in a windowless room guarded by armed police officers for upwards of six hours, and interrogated them about their social media postings and affiliations with other African-American youth.

2.      During the interrogations, school administrators showed the students photographs of African-American Colerain High School students that had been collected jointly by the police and school staff who trawled social media sites.

3.      The photographs showed the students making various hand signs or participating in rap music videos.  Based on these images, school administrators accused more than a dozen African-American students of making "street" signs and belonging to a "gang."   School administrators said that these social media postings had made "several" unidentified parents and students feel "uncomfortable."

4.      These accusations by school administrators were unfounded.  Moreover, white students at Colerain High School engaged in similar conduct and were neither questioned, searched, seized, nor disciplined.

5.      The Colerain Chief of Police Mark Denney and Northwest Local School District Superintendent Andrew Jackson did not actually believe that the African-American students rounded up on April 10, 2014 were part of a criminal gang.  In fact, Defendant Denney and Defendant Jackson both publicly stated that rumors suggesting a gang existed at Colerain High School were false.  Defendant Denney later described the April 10 operation of herding African-American students into a room secured by the use of armed police officers and then expelling those students from Colerain High School as nothing more than a "proactive approach by the District to squelch these rumors [of a gang]."

6.      Defendants unlawfully detained and disciplined the African-American students merely to placate the unfounded fears of a few parents and students about a nonexistent criminal gang at Colerain High School.

7.      Plaintiffs E.H., R.S., T.H., and W.P. were four of the African-American students rounded up, detained, interrogated, and subsequently suspended and expelled from Colerain High School on April 10, 2014.

8.      Defendants acted in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution by deciding to scapegoat and persecute E.H., R.S., T.H., and W.P. in order to improperly appease a small number of parents who expressed concerns about the social media postings of African-American students.  Defendants violated Plaintiffs' rights of free speech and voluntary association by excluding them from school for innocuous postings on social media sites done outside of school hours and for associating with

other African-Americans. Defendants violated Plaintiffs' right to be free of unreasonable search and seizure by detaining them at school for hours in a room secured by an armed police force when they had no basis to believe that Plaintiffs had engaged in unlawful conduct. Defendants violated Plaintiffs' due process rights by conducting a sham investigation, ignoring evidence that Plaintiffs were not involved in any wrongdoing, and refusing to provide Plaintiffs with the information relied upon in deciding to remove Plaintiffs from school.

9. Since April 10, Defendants have compounded the serious harms that they have caused Plaintiffs by carrying out a plan to harass Plaintiffs. Among other things, Defendants have excluded them from extracurricular activities when they returned to school from their expulsions; and Colerain Township police officers have unlawfully detained, searched, threatened, and interrogated them while they were associating with friends in the community.

10. E.H., R.S., T.H., and W.P. believe that they will continue to be subjected to the unlawful, intimidating, and ostracizing acts of Colerain High School administrators and Colerain Township police officers such as those they experienced on April 10, 2014 and have continued to experience. They are fearful that they will continue to be targeted by the Colerain Township Police Department officers just for associating with friends in their neighborhoods and are reluctant to leave their homes unless accompanied by their parents. They know that their opportunities to graduate from high school, pursue post-secondary education, and obtain employment have been hurt because of Defendants' unconstitutional acts.

11. Defendants' systematic wrongful conduct has adversely and permanently changed how Plaintiffs see themselves and their place in the world. Plaintiffs no longer believe that their teachers, coaches, or school administrators want them to succeed in life but instead believe these Defendants are determined to destroy their dreams for their futures. Plaintiffs no longer trust the

4

Defendants to protect them but instead fear that the Defendants will wrongfully accuse and punish them simply because they are African-American.

12. The only complete remedy for Plaintiffs would be to turn back the clock to a date before April 10, 2014. Since that is impossible, Plaintiffs seek judicial relief to return them as much as possible to the circumstances of their lives prior to April 10, 2014. They also seek the protection of the Court so that they may complete their high school education without additional unlawful interference by Defendants.

13. Plaintiffs seek injunctive relief and declaratory relief including but not limited to (1) a declaration that the acts of Defendants were unconstitutional; (2) a complete expungement of any reference to Plaintiffs' suspensions and expulsions in their transcripts and student files; and (3) changes in the policies and procedures of Northwest Local School District and Colerain Township Police Department so that the same constitutional violations do not happen again to Plaintiffs. Plaintiffs also seek compensatory and punitive damages against Defendants for the violations of numerous constitutional rights.

## JURISDICTION AND VENUE

14. This Court has jurisdiction over the federal claims presented in this Complaint pursuant to 28 U.S.C. § 1331, as well as jurisdiction pursuant to 28 U.S.C. §1343. Plaintiffs' federal claims are made pursuant to the First, Fourth, and Fourteenth Amendments to the United States Constitution as well as 42 U.S.C. §§1983 and 1985. Declaratory relief is authorized by 28 U.S.C. §§ 2201 and 2202.

15. Venue is proper in the Southern District of Ohio under 28 U.S.C. §1391(b) in that all of the Defendants are situated within and all of the Plaintiffs reside within this judicial

district, and because all of the acts and/or omissions in the Complaint occurred in this judicial district.

**PARTIES**

    **A.**    **PLAINTIFFS**

16.    Plaintiff E.H. is a 17-year old, African-American male resident of Colerain Township, Ohio. On April 10, 2014, E.H. was a ninth-grade student at Colerain High School. Plaintiff E.H. brings his claims by and through his parent, Constance Hildebrand.

17.    Plaintiff R.S. is a 17-year old, African-American male resident of Colerain Township, Ohio. On April 10, 2014, R.S. was an eleventh-grade student at Colerain High School. Plaintiff R.S. brings his claims by and through his parents, Kimberly Sargent and Robert Sargent.

18.    Plaintiff T.H. is a 17-year old, African-American male resident of Colerain Township, Ohio. On April 10, 2014, T.H. was an eleventh-grade student at Colerain High School. Plaintiff T.H. brings his claims by and through his parent, Teressa Heath.

19.    Plaintiff W.P. is a 15-year old, African-American male resident of Colerain Township, Ohio. On April 10, 2014, W.P. was a tenth-grade student at Colerain High School. Plaintiff W.P. brings his claims by and through his parents, Michael Packnett and Jacquel Dean.

    **B.**    **DEFENDANTS**

20.    Defendant Northwest Local School District ("the District") was created and is maintained pursuant to Ohio Revised Code § 3311.03 for the purpose of providing public education to school-aged pupils within its geographical borders. The District is a "person" within the meaning of 42 U.S.C. § 1983.

21.     Defendant Northwest Local School District Board of Education ("the Board") is a corporation organized and maintained under the laws of the State of Ohio as the elected governing body of the Northwest Local School District under Ohio Revised Code § 3313.17, having the authority to sue and be sued.  The Board is a "person" within the meaning of 42 U.S.C. § 1983.

22.     Defendant Andrew Jackson is and was at all relevant times the Superintendent of the District.  Superintendent Jackson is charged and authorized under O.R.C. § 3319.01 with the day-to-day supervision and management of the District's affairs, including student discipline.  As more fully set forth below, Superintendent Jackson was involved in the planning of the April 10 seizure, detention, and interrogation of Plaintiffs and in their discipline.  All actions taken by Defendant Jackson were taken while he was acting in the course and scope of his employment and under color of state law.  He is sued in both his individual and official capacities.

23.     Defendant Pauletta Crowley is and was at all relevant times the Assistant Director of Community and Student Services.  As more fully set forth below, Defendant Crowley was involved in the April 10 seizure, detention, and interrogation of Plaintiffs and in their discipline.  All actions taken by Defendant Crowley were taken while she was acting in the course and scope of her employment and under color of state law.  She is sued in both her individual and official capacities.

24.     Defendants the District, the Board, Andrew Jackson, and Pauletta Crowley are collectively referred to in this complaint as the "District Defendants."

25.     Defendant Maureen Heintz was at all relevant times the Principal of Colerain High School ("School").  As such, she was charged with maintaining order and discipline within the school and enforcing its rules in compliance with state and federal law.  As more fully set

7

forth below, Principal Heintz was involved in the April 10, 2014 seizure, detention, and interrogation of Plaintiffs and in their discipline. Defendant Heintz is no longer Principal of Colerain High School, but all actions taken by Defendant Heintz were taken while she was acting in the course and scope of her employment and under color of state law. She is sued in both her individual and official capacities.

26. Defendant George Sturgeon is and was at all relevant times an Assistant Principal at Colerain High School. As such, he is charged with maintaining order and discipline within the school and enforcing its rules in compliance with state and federal law. As more fully set forth below, Assistant Principal Sturgeon was involved in the April 10, 2014 seizure, detention, and interrogation of Plaintiffs and in their discipline. All actions taken by Defendant Sturgeon were taken while he was acting in the course and scope of his employment and under color of state law. He is sued in both his individual and official capacities.

27. Defendant Joe Bertram is and was at all relevant times an Assistant Principal at Colerain High School. As more fully set forth below, Assistant Principal Bertram was involved in the April 10, 2014 seizure, detention, and interrogation of Plaintiffs and in their discipline. All actions taken by Defendant Bertram were taken while he was acting in the course and scope of his employment. As such, he was charged with maintaining order and discipline within the school and enforcing its rules in compliance with state and federal law and under color of state law. He is sued in both his individual and official capacities.

28. Defendant Robert Reynolds is and was at all relevant times an Assistant Principal at Colerain High School. As more fully set forth below, Assistant Principal Reynolds was involved in the April 10, 2014 seizure, detention, and interrogation of Plaintiffs and in their discipline. All actions taken by Defendant Reynolds were taken while he was acting in the

8

course and scope of his employment. As such, he was charged with maintaining order and discipline within the school and enforcing its rules in compliance with state and federal law and under color of state law. He is sued in both his individual and official capacities

29.     Defendant Dan Bolden is and was at all relevant times the Athletic Director for Colerain High School. As more fully set forth below, Defendant Bolden was involved in the April 10, 2014 seizure, detention, and interrogation of Plaintiffs. All actions taken by Defendant Bolden were taken while he was acting in the course and scope of his employment and under color of state law. He is sued in his individual capacity.

30.     Defendant Matthew Stoinoff is and was at all relevant times a football coach at Colerain High School. As more fully set forth below, Defendant Stoinoff was involved in the April 10, 2014 seizure, detention, and interrogation of Plaintiffs. All actions taken by Defendant Stoinoff were taken while he was acting in the course and scope of his employment and under color of state law. He is sued in his individual capacity.

31.     Defendants Heintz, Sturgeon, Bertram, Reynolds, Bolden, and Stoinoff are collectively referred to in this complaint as the "School Defendants."

32.     Defendant Colerain Township Board of Trustees is the governing body of Colerain Township Ohio, acting pursuant to Ohio Revised Code § 503.01 and having the authority to sue and be sued in its corporate name. It is responsible for the Colerain Township Police Department. The Board is a "person" within the meaning of 42 U.S.C. § 1983.

33.     Defendants Jeff Ritter, Melinda Rinehart, and Dennis Deters are and at all relevant times were and are the three trustees of Colerain Township, Ohio. They are sued in their official capacities.

34.     Mark Denney is and was at all relevant times the Chief of Police at Colerain Township Police Department ("Police").  Mr. Denney is responsible for setting policy, training, supervising employees, and managing Colerain Township Police Department.  As more fully set forth below, Defendant Denney was involved in the planning of the April 10, 2014 seizure, detention, and interrogation of Plaintiffs.  Defendant Denney also participated in maintaining personal data on the Plaintiffs in order to allow the Colerain Police Department to monitor the lawful activities of the Plaintiffs without their permission after the April 10, 2014 operation.  All actions taken by Defendant Denney were taken while he was acting in the course and scope of his employment and under color of state law.  He is sued in his official and individual capacity.

35.     Ashley Meyer is and was at all relevant times the School Resource Office for Colerain High School and a Police Officer with the Colerain Township Police Department.  All actions taken by Defendant Meyer were taken while she was acting in the course and scope of her employment and under color of state law.  She is sued in her official and individual capacity.

36.     Defendant Officers Doe, 1-6 at all relevant times were duly appointed and employed as police officers by the Colerain Police Department, acting in the course and scope of their employment and under color of state law.  As more fully set forth below, these Doe Defendants participated in the seizure and detention of Plaintiffs on April 10, 2014.  They are sued in their individual capacities.

37.     Defendant Officers Doe 1 and 7 at all relevant times were duly appointed and employed as police officers by the Colerain Police Department, acting in the course and scope of their employment and under color of state law.  As more fully set forth below, Defendant Officers Doe 1 and 7 participated in the harassment of Plaintiff E.H. on June 28, 2014.  Officer

Doe 1 also participated in the harassment of Plaintiff E.H. on or about July 2, 2014. They are sued in their individual capacities.

38.     Defendant Officer Doe 8 at all relevant times was duly appointed and employed as a police officer by the Colerain Police Department, acting in the course and scope of his employment and under color of state law. As more fully set forth below, Defendant Officer Doe 8 participated in the harassment of Plaintiff T.H. on June 30, 2014. He is sued in his individual capacity.

39.     Defendant Officer Doe 9 at all relevant times was duly appointed and employed as a police officer by the Colerain Police Department, acting in the course and scope of his employment and under color of state law. As more fully set forth below, Defendant Officer Doe 9 participated in the harassment of Plaintiff T.H. on August 8, 2014. He is sued in his individual capacity.

40.     Defendants Colerain Township, Chief Denney, Officer Meyer, and all Doe Officers are collectively referred to in this complaint as "Police Defendants." The Doe Defendants are referred to as the "Police Officers" in this complaint.

## FACTUAL ALLEGATIONS

41.     Northwest Local School District is the second-largest school district in Hamilton County, Ohio with a total student enrollment of over 9,000.

42.     In recent years, the geographical area served by the District has become increasingly racially diverse. African Americans represent a growing racial minority of the student population in the District. In the 2001-2002 school year, African-Americans were approximately 15 percent of the District's students. In the 2012-2013 school year, African-

Americans made up more than 25 percent of the District's students - with multiracial students comprising another 8 percent.

43.     The District has had significant disparities in its discipline in the last several years with African-American students being disproportionately disciplined more often and more severely than White students.  Currently, the federal Department of Education's Office of Civil Rights is investigating a class complaint against the District for race and disability discrimination.  The Legal Aid Society of Southwest Ohio, LLC filed this class complaint in March 2012.

44.     The District has two high schools, one of which is Colerain High School. Approximately 2,000 students attend Colerain High School.  About 70 percent of the school's students are white; 21 percent are African-American; and 4.7 percent are multiracial.

45.     The District has a close relationship with the Colerain Police Department and contracts with Colerain Township to provide security and investigative services for the district. Colerain High School uses a Colerain Police Department officer as its school resource officer during school hours.

**<u>April 10, 2014 Round up and Removal of African-American Students from</u>**
**<u>Colerain High School</u>**

46.     In the early spring of 2014, Colerain High School found itself spotlighted in the media because of two crimes.  On March 25, 2014, an African-American student brought a handgun to Colerain High School.  The student was removed from school and criminally charged.  No one was threatened or hurt, but the media covered the event extensively.

47.     On April 5, 2014, a white man who was formerly a Colerain High School student was allegedly shot by an African-American Colerain High School student in Green Township, Ohio.  The alleged shooter was not apprehended until several weeks later.  This crime and the

victim and perpetrator's present and past connections to Colerain High School were repeatedly mentioned in various media sources.

48.     Shortly after the extensive media coverage of these crimes, Colerain High School administrators received "several" complaints from students and parents about images and videos on social media depicting other African-American students who attended Colerain High School.

49.     The school administrators stated that these "several" parents and students had complained that they had been made "uncomfortable" by photographs of African-American students making hand gestures that were posted on social media sites.  They were also "uncomfortable" with online rap music videos performed by African-American students, particularly videos performed by a group whose name was the "Money Gang."

50.     The hand gestures and music videos expressed for the African-American students self-identities and artistic expressions of belonging to a hip-hop culture.  Hip-hop culture has its own vocabulary, both in words and hand signs, much of which is metaphorical.

51.     In response to these complaints, the District and School Defendants, in collaboration with the Police Defendants, conducted a multi-day investigation into online, outside-of-school activities of African-American students at Colerain High School.

52.     The Defendants then created a list of African-American students that they believed had been a part of the group "Money Gang", had associated with members of the "Money Gang" or had displayed hand gestures in online social media postings.  Upon information and belief, the list included personal identifying information about these students, such as their Twitter account handles, names of their girlfriends, makes and models of their cars, home addresses, and school photographs.

13

53.     The District, School, and Police Defendants understood the "Money Gang" to be a loose association of African-American boys who played sports with one another and made rap music videos outside of school hours.  The Defendants had nothing to suggest that any of the Plaintiffs had been involved in any criminal activity.

54.     The "Money Gang" was nothing more than the name used by a group of African-American students when performing music videos outside of school hours.  Many of the students also played sports together or associated with one another as friends.  None of the Plaintiffs were involved in any unlawful activities.  None of the Plaintiffs had ever been involved with the police.  They had never even been cited to juvenile court.  The name was chosen for the music group by someone other than the Plaintiffs.  The "Money Gang" is relatively common parlance within some groups.   It is hip-hop clothing line.  It is also the name of a basketball team comprised of National Basketball Association players and celebrity players who raise money to assist at-risk youth in the areas of career development and college preparation.

55.     At the conclusion of their investigation, the District, School, and Police Defendants decided to address the concerns of the "several" parents and students by suspending and expelling anyone who had shown what they thought to be a "street" sign in online photographs, had participated in "Money Gang" music videos, or had otherwise associated with "Money Gang" group members.

56.     The District, School, and Police Defendants jointly decided they would do this at the very start of the school day on April 10, 2014.  Based on the large number of African-American students that the District planned to remove from school, Superintendent Jackson asked Chief Denney to provide additional Colerain Township police officers for that day.

57.     At the start of the school day on April 10, 2014, there were numerous police cruisers in the parking lot at Colerain High School and numerous armed police officers milling about the campus.

58.     Police Officers along with School Defendants began rounding up African-American students including Plaintiffs between 7:20 a.m. and 7:50 a.m., frisking them, searching their book bags, confiscating their cell phones, and placing them in a windowless room guarded by armed police officers standing outside the room and school administrators inside the room.

59.     The Defendants apparently failed to anticipate the massive disruption that would be caused to the school community by having so many police cruisers and officers present at the school.  The impact was magnified due to the March 25 incident of a student bringing a gun to school and the April 5 shooting in a neighboring community.

60.     Seeing the significant police presence at the school and believing that it meant a serious crime had occurred, students began texting and tweeting about the police presence at Colerain High School to their parents and others.  As the morning unfolded, hundreds of parents arrived at the school to pick up their children.

61.     Throughout the rest of the day, School Defendants removed and individually interrogated each of the African-American students, including Plaintiffs, who were being held in the room.  School Defendants told the students, including Plaintiffs, that they could not leave the room and could not call their parents until after their interrogation.

62.     The School Defendants gave no explanation about why students had been brought to the room until individual interrogations took place.  Some of the interrogations happened more than five hours after the students were initially detained in the room.

15

63.     At the close of each interrogation, the School Defendants called the parent(s) of that student stating that their son had been emergency removed from school, suspended, and proposed for expulsion.  The School Defendants directed the parents to come to the school immediately to pick up their sons.

64.     When the Plaintiffs' parents arrived at the school to pick up their children, they were only allowed to enter the school escorted by at least one Police Officer.

65.     When Plaintiffs and their parents left the building they were again escorted by at least one Police Officer.  Students, school staff, and the many parents who had come to pick up students all witnessed Plaintiffs being escorted out by police.  Plaintiffs were humiliated by this and believe that the students, staff, and parents who witnessed them being escorted by police assumed that they were criminals.

**E.H.**

66.     On the morning of Thursday, April 10, Plaintiff E.H. returned to Colerain High School after having been absent for two days because of an injury.

67.     Immediately upon entering the school building, E.H. was stopped by Defendant Coach Stoinoff and Defendant Principal Maureen Heintz.  They advised E.H. that he must come with them immediately.

68.     E.H. was escorted by Defendant Heintz to a small room on the first floor of the high school with no windows.

69.     When E.H. entered the room, he saw that several other African-American students were already in the room.

16

70.     Along with Defendant Heintz, three Police Officers were stationed inside of the room.  Defendant Heintz commanded E.H. to turn over his cell-phone, put his book bag in the corner of the room with those of the other students, and sit down.  E.H. did as he was ordered.

71.     For approximately one hour, E.H. was held in the windowless room along with the other students.

72.     At all times, several of the Police Officers were stationed outside the door to the room where E.H. was detained.  E.H. believed that the door was locked from the outside and knew that there was no way he could exit the room in any case since the police were guarding it.

73.     During the course of the hour, other African-American students were brought into the room and instructed to take a seat.

74.     While he was in the room, E.H. was not allowed to leave or use the bathroom, nor was he given anything to eat or drink.

75.     After about an hour, Defendant Heintz returned to the room with two of the Police Officers and directed E.H. to come with them.  They took him to Defendant Assistant Principal Joe Bertram's office.   Present in the office were Defendant Bertram, Defendant Assistant Principal Reynolds, and Defendant Coach Stoinoff.

76.     Defendant Bertram asked E.H. to pull down his pants and turn out the pockets of the shorts he was wearing underneath.  E.H. did so.

77.     Defendant Bertram then instructed Defendant Reynolds to go and search E.H.'s school locker.  Defendant Reynolds did and reported finding nothing except a Spanish book.

78.     Defendant Stoinoff proceeded to search E.H.'s confiscated book bag.

79.     Neither the Police Officers nor School Defendants asked the consent of E.H. to search his locker, or his book bag.  Neither did the Police Officers nor School Defendants have

any reasonable basis to suspect that E.H., his locker, or his book bag contained contraband or evidence of wrongdoing.

80.   Defendant Bertram then began to interrogate E.H.

81.   Defendant Bertram asked whether E.H. was familiar with the gang "The Bloods." E.H. said he might have heard of them from television but he was not familiar with them. Defendant Bertram asked E.H. if he knew of lyrics from the music group "Blood Line." E.H. said he did not.

82.   Defendant Bertram showed E.H. a photograph of E.H., Plaintiff W.P., and two other male African-American Colerain High School students.  The photograph depicted Plaintiffs E.H., W.P, and the two other students in the parking lot of the school after a Colerain High School basketball game that had taken place in the winter.

83.   E.H. had no idea how Defendant Bertram had obtained the photograph.  E.H. does not use social media and had not posted the photograph to any social media site.

84.   Defendant Bertram accused E.H. of being in a gang based solely on this photograph.   Defendant Bertram said he knew that E.H. was making a gang-sign in the photograph, and accused him of being in a "gang." E.H. repeatedly told Defendant Bertram he was not making a gang sign and was not in a gang.

85.   Defendant Bertram stated that the parents of a few students had called him and claimed that they would not send their kids to school until E.H. and the other African-American students who had been held in the room were removed.

86.   Defendant Bertram interrogated E.H. for approximately 45 minutes about whether he was in a gang, knew any gang members, or knew anything about the shooting that had

occurred in Green Township on April 5. E.H. truthfully answered all of those questions in the negative.

87.     E.H. was very scared because Defendant Bertram was accusing him of being involved in a gang and questioning him about a crime while police officers were right outside the door.

88.     E.H. had never had any involvement with police officers prior to April 10, had never been interrogated for being involved in any crime, and had never been charged with any unlawful activity.

89.     Defendant Bertram told E.H. that if he wrote what Defendant Bertram told him to in a statement he could return to class. Under duress, E.H. wrote a statement saying what Defendant Bertram told him to write.

90.     After E.H. wrote the statement, Defendant Bertram said that E.H. would not be allowed to return to class and that Defendant Bertram would be calling E.H.'s mother to pick him up because he was being expelled from school.

91.     Defendant Bertram handed E.H. a notice of removal. The notice stated that E.H. had violated the following District Code of Conduct rules: Rule 105, disruption or interference with activities; Rule 143, demonstrations by individuals or groups causing disruption to the school program; and Rule 155, any other activity that the pupil knows or should know will disrupt the academic process. The written notice further stated that E.H. was being suspended from school for 10 days and would be proposed for expulsion.

92.     At approximately 10:45am on April 10, an unknown member of the school staff contacted E.H.'s mother, Constance Hildebrand, and advised her that E.H. was being suspended

from school and would be recommended for expulsion.  The staff member told Ms. Hildebrand that she needed to come to school immediately to pick up her son.

93.     Upon arriving at the school, Ms. Hildebrand saw a line of adults streaming out of the front entrance.  She also saw many police vehicles and police officers on the Colerain High School campus.

94.     Ms. Hildebrand got in the line of adults. A short time later, a Colerain Township police officer came outside with a clipboard and called out her name.  She responded that she was Ms. Hildebrand and was then escorted by this police officer into the building and taken to the main office.  A police officer brought E.H. to her.  Both Ms. Hildebrand and E.H. were then promptly escorted from the campus by one of the Police Officers.

95.     Later in the afternoon of April 10, Ms. Hildebrand received a phone call from Defendant Bertram.

96.     Defendant Bertram told her that E.H. was a known gang member and had been identified in a photograph with other gang members.

97.     He also told her that E.H. was somehow involved in the April 5 shooting that had occurred outside of school hours in Green Township.

98.     Ms. Hildebrand was terrified and confused by these allegations.

99.     Ms. Hildebrand requested a hearing to contest E.H.'s suspension and the recommended expulsion from school.

100.    During the suspension appeal and expulsion hearing, the only evidence offered by the District that E.H. had violated a Code of Conduct provision was a photograph of E.H. with three other African-American boys.  The photo had been taken months earlier at a Colerain High

School basketball game and posted on an undisclosed date on the Twitter account of a student other than E.H.

101.    Based solely on that photograph, Defendant Bertram continued to assert in these disciplinary hearings that E.H. was in a gang.

102.    Superintendent Jackson upheld the school's discipline of E.H. and expelled E.H. for ten days in addition to his ten day suspension.

103.    Following the expulsion hearing, E.H.'s mother, Ms. Hildebrand, made three attempts to reach Defendant Pauletta Crowley - twice by phone and once in writing-to appeal E.H.'s expulsion.

104.    Defendant Crowley ignored her telephone calls.  When she finally responded to Ms. Hildebrand's written request for an appeal, she said that the District would not allow Ms. Hildebrand to appeal the expulsion because her written request was untimely, and E.H. had already returned to school.

105.    During E.H.'s expulsion, Ms. Hildebrand visited the school on three separate occasions to collect school work for E.H., but she was told each time that there was no work available.  On a fourth visit, she was given some Art and English assignments.  She never received work for her son's other classes.

106.    Because of the unwarranted discipline and the days out of school, E.H. had diminished academic performance and reduced grades in the fourth quarter of the school-year.

107.    E.H. had never been expelled prior to this incident.  E.H. now has an expulsion on his permanent school record.  Unless it is removed, this will be reported to colleges, universities, and military service during any application process or when applying for financial aid.

**R.S.**

108.     At approximately 7:20 a.m. on April 10, R.S. was at Colerain High School waiting to board a school bus to go to his digital media class when Defendant Assistant Principal Sturgeon approached R.S. and told him to accompany him into the school building.

109.     Defendant Sturgeon told R.S. that he would be allowed to go to class after he answered a few questions.

110.     Defendant Sturgeon escorted R.S. into Colerain High School and walked him to a windowless room. Guarding the door of the room were several Police Officers. The Police Officers were armed and in uniform.

111.     Two of the Police Officers took R.S. aside, frisked him, confiscated his cell phone, searched his book bag and then escorted him into the classroom.

112.     Neither Police Officers nor Defendant Sturgeon asked for the consent of R.S. to search him, confiscate his cell phone, or search his book bag. They also had no reasonable basis to suspect that R.S., his cell phone, or his book bag contained contraband or evidence of any wrongdoing.

113.     After frisking him and searching his belongings, the two Police Officers took R.S. into the windowless room and told him to sit down.

114.     R.S. asked Defendant Heintz why they were there, and she replied that they would all find out soon enough.

115.     For the next five hours, Defendants held R.S. in this windowless room, never telling him why he was there.

116.     School administrators and police officers began bringing additional African-American students to the windowless room.

117.    Over the next five hours, Police Officers escorted students one at a time out of the room.  These students never returned to the room.

118.    Throughout the day, School Defendants stayed in the room to monitor the students.  During the entire time that R.S. was in the room, Police Officers guarded the only exit to the room.

119.    R.S. asked on several occasions to use the bathroom but was not allowed to do so.

120.    R.S. normally ate lunch at 11:30 a.m.  R.S. was not allowed to eat lunch on April 10.  No one brought any food or water during the more than five hours that he was held in the room.

121.    At approximately 1:00 p.m., two Police Officers entered the room and asked R.S. to come with them.

122.    These Police Officers took R.S. to the office of Defendant Assistant Principal Sturgeon.

123.    Defendant Sturgeon told R.S. that he would be suspended for gang activity and promoting gang activity.

124.    R.S. was not part of a criminal gang and denied being part of any sort of gang. He asked why Defendant Sturgeon was accusing him of belonging to a gang.

125.    Defendant Sturgeon responded by taking some photographs out of his desk showing African-American Colerain High School students.  Defendant Sturgeon stated that the photographs showed that R.S. belonged to a gang called the "Money Gang."

126.    R.S. explained that he had taken some music videos for rap music groups, including the Money Gang, outside of school hours but that he was not part of the "Money Gang."

127.    Defendant Sturgeon asked R.S. about one photograph in particular where he was present with another African-American student making hand signs.  Defendant Sturgeon described the signs the students were making as "gang" signs.

128.    R.S. explained that the photograph was a still taken from a music video that R.S. had made for his Colerain High School digital media class in December 2013.  R.S. further explained that his digital media teacher had given him the grade of "A" for the video.

129.    R.S. was both outraged and nervous that Defendant Sturgeon was alleging he was part of a gang.  R.S. has never been charged with any illegal behavior and had never had any experience with the police prior to the April 10 school roundup.

130.    Based solely on R.S.'s presence in a few photographs on social media sites with other African-American students and R.S's acknowledgment that he had produced music videos for the music group the "Money Gang", Defendant Sturgeon told R.S. that he was being emergency removed from school, suspended for ten days out of school, and proposed for expulsion for gang activity.

131.    Defendant Sturgeon handed R.S. a notice of removal that had been written out by Defendant Sturgeon before R.S. entered the room.  The notice stated that R.S. had violated the following District Code of Conduct rules:  Rule 105, disruption or interference with activities; Rule 143, demonstrations by individuals or groups causing disruption to the school program; and Rule 155, any other activity that the pupil knows or should know will disrupt the academic process. The written notice further stated that R.S. was being suspended from school for 10 days and would be proposed for expulsion.

132.    School and District Defendants made the decision to suspend and propose to expel R.S. before speaking with R.S. about the alleged violations of the school code of conduct or hearing his side of the story.

133.    School and District Defendants made the decision to suspend and propose to expel R.S. without conducting a meaningful investigation.  Defendant Sturgeon did not speak with R.S.'s digital media teacher, an employee of the District, to determine whether the primary photograph he was using to expel R.S. had indeed been taken as part of his digital media class as R.S. stated in his interrogation.

134.    At approximately 1:15 p.m., Defendant Sturgeon called R.S.'s father and told him that R.S. was being suspended for being in a gang and making gang signs and that he needed to pick up R.S. immediately.

135.    After Defendant Sturgeon gave R.S. written notice of his removal from school, another Police officer escorted R.S. to a different classroom to wait for his father to pick him up.

136.    While in the room, R.S. became upset about what had happened.  He raised his voice and hit a filing cabinet with his hand.  Defendant Stoinoff, who was guarding R.S. in this room, shouted, "Now we have our [code of conduct] infraction!"

137.    The Police Officer who was also in the room guarding R.S. placed R.S. in handcuffs and kept him in handcuffs for approximately 30 minutes.  R.S. complained that the handcuffs were hurting him, but the Police Officer initially refused to loosen them.

138.    Shortly before R.S.'s father arrived to pick him up, a Police Officer released R.S. from the handcuffs, stating that they did not want the other students' parents waiting to pick up their children to see him in handcuffs.

139.    R.S. and his parents asked for a hearing to challenge the proposed expulsion.  The District held R.S.'s expulsion hearing on April 24, 2014.  The hearing officer for the expulsion hearing was an attorney from the law firm that represented the school district in all matters.

140.    After the expulsion hearing, and by letter dated April 25, 2014, Defendant Superintendent Jackson issued notice of his decision to expel R.S. for 5 school days.

141.    R.S. was excluded from school for a total of 16 school days.

142.    R.S.'s parents appealed the expulsion decision.  The District held a hearing on May 20, 2014 on this expulsion appeal.

143.    In preparation for the appeal hearing, R.S.'s parents and counsel requested to be allowed to review all documents that district was relying upon to expel R.S.  The district refused to provide any of the photographs or video clips to R.S.'s parents or R.S.'s counsel before the expulsion appeal.

144.    In a decision dated June 9, 2014, the expulsion appeal hearing officer wrote a decision stating that there was no evidence to support that R.S. had violated any of the school's Code of Conduct Regulations.

145.    By that time, R.S. had already served his time out of school and lost 16 days of instruction.  Because of this lost instruction, R.S. had diminished academic performance and reduced grades in the fourth quarter of the school-year.

146.    Because of his removal from school, R.S. also lost paid employment to film a Parent Teacher Association dance recital at an elementary school in the District since he was not allowed to be on school grounds during his removal period.

147.    R.S. still has a ten-day suspension included in his permanent school record. Unless this is removed, it will be reported to colleges, universities, and military service during the application process or when R.S. applies for financial aid.

**T.H.**

148.    On April 10, 2014 at approximately 7:40 a.m. Plaintiff T.H. was sitting in his first bell class when Defendant Bolden came to his classroom and told him to come with him and bring his book bag.

149.    Defendant Bolden then escorted T.H. to the classroom where other African-American students were being held.

150.    At the time that T.H. was brought to the room, several Police Officers were guarding the room.  T.H. had to walk past these armed Police Officers to enter the room.  School Defendants were in the room to monitor the students.

151.    Defendant Heintz made T.H. hand over his cell phone before he went into the room

152.    T.H. was not allowed to leave the room, was not allowed to use the restroom, and was not offered anything to eat or drink while he was in the room.  During the several hours that T.H. was in the room, Police Officers guarded the only exit to the room.

153.    After T.H. had been in the room for approximately two hours, Defendant Heintz escorted him to the office of Defendant Sturgeon.

154.    When T.H. entered the office, Defendant Sturgeon told T.H. to take everything out of his pockets.  Defendant Sturgeon then accused T.H. of threatening and harassing fellow students by being part of the "Money Gang" and by using gang-related hand signals.

155. T.H. was stunned by the accusations and denied them. T.H. explained to Defendant Sturgeon that he had participated in a couple of music videos with the music group "Money Gang" because he was friends with some of the African-American teenagers who made rap music in various groups including the "Money Gang."

156. T.H. also explained that "Money Gang" described a group of friends who played music together and sports together.

157. Defendant Sturgeon told T.H. he was also in trouble for intimidating a staff member who issued late passes to class by giving her a mean look. Later, upon questioning about what sort of look T.H. had given the white staff member, Defendant Sturgeon described the look as one where T.H. furrowed his brows.

158. Defendant Sturgeon also said that T.H. had violated the Code of Conduct because a couple of unidentified students had felt threatened by T.H.'s "body language" and the "body language" of members of the "Money Gang."

159. Finally, Defendant Sturgeon stated that T.H. had been present when a group of African-American students approached a group of white students in the lunchroom and made threats.

160. Although initially stating under oath that the incident in the lunchroom had happened in April 2014, Defendant Sturgeon would later state that the event occurred in February 2014, had been addressed at the time by a verbal reprimand from another assistant principal, and had been instigated by the white students who had made provoking comments to T.H.'s friends.

161. Upon information and belief, the white students were never disciplined for their actions in the lunchroom.

162.    Based on T.H.'s participation in music videos with the group the "Money Gang" and the above acts that Defendant Sturgeon characterized as intimidating, Defendant Sturgeon told T.H. that he was being emergency removed from school, suspended for ten days out of school, and proposed for expulsion for gang activity.

163.    Defendant Sturgeon handed T.H. a notice of removal that Defendant Sturgeon had written out before T.H. entered the room.  The notice stated that T.H. had violated the following school code of conduct rules:  Rule 105, interference with school activity; Rule 143, demonstrations by individuals or groups causing disruption to the school program; Rule 155, any other activity that the pupil knows or should know will disrupt the academic process; Rule 122, hazing, threatening, harassing of students; Rule 159, threatening staff, and Rule 102, disrespect of staff. The written notice further stated that T.H. was being emergency removed, was being suspended from school for 10 days and would be proposed for expulsion.

164.    School and District Defendants had made the decision to suspend and propose to expel T.H. before speaking with T.H. about the alleged violations of the school code of conduct or hearing his side of the story.

165.    Shortly after 10:00 a.m., Defendant Sturgeon called T.H.'s mother.

166.    Defendant Sturgeon told T.H.'s mother that T.H. was being suspended and proposed for expulsion and that she needed to pick T.H. immediately.

167.    After Defendant Sturgeon had given T.H. written notice of his removal from school, T.H. was escorted to a different room to wait for his mother to pick him up.

168.    When T.H.'s mother arrived at the school, she and T.H. were escorted to their car by one of the Police Officers.

169.    T.H. and his mother asked for a hearing to challenge the proposed expulsion.  The District held T.H.'s expulsion hearing on April 15, 2014.  The hearing officer for the expulsion hearing was an attorney from the law firm that represented the school district in all matters.

170.    In preparation for the hearing, T.H.'s mother and counsel requested to be allowed to review all documents the district was relying upon to expel T.H.  The district refused to provide any of the photographs or video clips that it was relying upon to T.H.'s mother or T.H.'s counsel before the expulsion appeal.

171.    After the expulsion hearing, Defendant Superintendent Jackson issued notice of his decision to expel T.H. for 36 days in addition to the ten day suspension for a total of 46 days.

172.    This decision by Defendant Jackson to expel T.H. for 36 days violated the Northwest Local School District's Expulsion Guidelines that stated that for a first expulsion a student would only be expelled for 10 days and the expulsion would only stay on the student's record for 45 days.

173.    T.H.'s mother appealed the expulsion decision.  The District held a hearing on May 1, 2014 on this expulsion appeal.

174.    Again, in preparation for the appeal hearing, T.H.'s parents and counsel requested to be allowed to review all documents that district was relying upon to expel T.H.  The district again refused to provide any of the photographs or video clips to T.H.'s parents or T.H.'s counsel before the expulsion appeal.

175.    In a decision dated May 8, 2014, the expulsion appeal hearing officer held T.H.'s expulsion in abeyance and allowed T.H. to attend the District's alternative school to earn sufficient credits to stay on track for graduation and to participate in extracurricular activities in the 2014-15 school year.

176.    By the time T.H. started at the alternative school on May 12, 2014, T.H. had already been out of school for twenty days.  Because of this lost instruction, T.H. had diminished academic performance and reduced grades in the fourth quarter of the school-year

177.    T.H. had never been expelled prior to this incident.  T.H. now has an expulsion on his permanent school record.  This will be reported to colleges, universities, and military service during the application process or when applying for financial aid.

**<u>W.P.</u>**

178.    On April 10, 2014 at approximately 7:50 a.m. Plaintiff W.P. was sitting in his first bell class when Defendant Assistant Principal Reynolds came to his classroom and told W.P. to come with him.

179.    Defendant Reynolds took W.P. to the windowless room where other African-American students were being held.

180.    At the time that W.P. was brought to the room, several Police Officers were guarding the room.  Defendant Heintz demanded that W.P. hand over his cell phone and his bookbag.  Defendant Heintz told W.P. to sit down but said nothing about why he had been brought to the room.

181.    School and Police Defendants detained W.P. in the room solely because W.P. had been observed in online rap music videos making hand gestures and singing, and in photographs with other African-American students making hand gestures.

182.    W.P. was not part of the music group the "Money Gang" but had participated in rap music videos with some friends outside of school hours.  W.P. participated in a band that called itself "Young Top Class" or "YTC."

183.    Upon information and belief, prior to bringing W.P. to the room, School and District Defendants had already decided that W.P. would be suspended and expelled from school solely because of his participation in online music videos and photographs with other African-American youth.

184.    W.P. was not allowed to leave the room, was not allowed to use the restroom, and was not offered anything to eat or drink while he was in the room.  During the entire time that W.P. was in the room, Police Officers guarded the only exit to the room.

185.    After approximately three hours, Defendant Heintz entered the room and told W.P. to leave the room.

186.    W.P. went to get his book bag and cell phone and leave the room.  W.P. still had not been told why he was in the room and was not sure where he was being taken.

187.    Defendant Heintz commanded W.P. to give her his phone.  W.P. did not immediately hand the phone over.

188.    Defendant Bolden then grabbed W.P., putting him in a bear hug in order to sieze his cell phone.  When W.P. did not immediately hand over his phone, Defendant Bolden slammed W.P. to the ground and put him in a chokehold while Defendant Stoinoff tried to grab his legs.

189.    Some of the Police Officers had entered the room. W.P. began to have trouble breathing and dropped his cell phone.  While Defendant Bolden still had W.P. in a chokehold lying on the ground, one of the Police Officers put handcuffs on W.P.

190.    Two of the Police Officers then escorted W.P. to Defendant Bertram's office.

191.    Defendant Bertram accused W.P. of using gang-related hand signals in the music video and being in a gang.

192.    Based on W.P.'s participation in rap music videos done outside of school hours, his presence in photographs with other African-American students, and his refusal to hand over his cell phone, Defendant Bertram told W.P. that he was being emergency removed from school, suspended for ten days out of school, and proposed for expulsion for gang activity.

193.    Defendant Bertram handed W.P. a notice of removal.  The notice stated that W.P. had violated the following school code of conduct rules:  Rule 104 disregard of direction, Rule 105 interference with school activity; Rule 143, demonstrations by individuals or groups causing disruption to the school program; Rule 155, any other activity that the pupil knows or should know will disrupt the academic process; Rule 121, cursing, and Rule 102, disrespect of staff. The written notice further stated that W.P. was being emergency removed, was being suspended from school for 10 days and would be proposed for expulsion.

194.    At approximately 12:45 p.m., Defendant Bertram called W.P.'s mother, Jacquel Dean.

195.    Defendant Bertram told W.P.'s mother that W.P. was being suspended and proposed for expulsion for being involved in gang-related activity.  Defendant Bertram told W.P.'s mother that she needed to pick up her son.

196.    W.P.'s father, Michael Packnett, came up to the school and found W.P. being escorted by one of the Police Officers from Mr. Bertram's office.  That same Police Officer then escorted W.P. and his father to their car.

197.    W.P. and his parents asked for a hearing to challenge the suspension and proposed expulsion.  The District upheld the suspension, and Defendant Jackson expelled W.P. for 36 days or through the end of the school year.

198.    This decision by Defendant Jackson to expel W.P. for 36 days violated the Northwest Local School District's Expulsion Guidelines that stated that for a first expulsion a student would only be expelled for 10 days and the expulsion would only stay on the student's record for 45 days.

199.    W.P.'s father appealed the expulsion decision.  The Board held a hearing on May 15, 2014 on this expulsion appeal.

200.    In preparation for the appeal hearing, W.P.'s parents and counsel requested to be allowed to review all documents that district was relying upon to expel W.P.  The district refused to provide any of the photographs or video clips to W.P's parents or W.P.'s counsel before the expulsion appeal.

201.    In a decision dated May 15, 2014, the expulsion appeal hearing officer upheld W.P.'s expulsion based on W.P.'s act in refusing to hand over his cell phone.

202.    W.P. had never been expelled prior to this incident.

203.    At the time W.P. was removed from school, he was taking five advanced classes and had "As" in all of his classes except for one "B" in Advanced Geometry.

204.    W.P. now has an expulsion on his record that will be reported to colleges, universities, and military service during the application process or when applying for financial aid.

205.    W.P experienced reduced grades as a result of the expulsion and inability to make up work since his expulsion was for more than ten days.

206.    W.P. believes that he will no longer be able to attend the college of his choice or obtain academic scholarships or other financial aid necessary for him to attend college because of the acts of Defendants.

**Conspiracy of Defendants to Violate Plaintiffs' Rights**

207.     The District, School and Police Defendants jointly planned, coordinated, and executed the April 10, 2014 operation against Plaintiffs and other African-American students.

208.     The District, School, and Police Defendants violated the Plaintiffs' right to be free of unreasonable searches and seizures when they forcibly held them in a windowless room guarded by armed police officers for multiple hours, confiscated their cell phones and book bags, refused to allow them to call their parents, leave the room, or use the bathroom, and refused to give them any food or drink.

209.     Upon information and belief, the District and School Defendants have never subjected any student except those disciplined on April 10 to such treatment, even when other students were charged with far more serious Code of Conduct violations or with unlawful activity.

210.     Defendants targeted Plaintiffs for this unlawful search and seizure and discipline because they were African-Americans.

211.     Around the time that Plaintiffs were disciplined for showing hand signs on social media sites, the social media sites of numerous Colerain High School white students and official Colerain High School social media sites had photographs showing white students displaying the same or similar hand gestures as those shown by Plaintiffs.  Upon information and belief, none of the white students have been disciplined for showing hand signs or accused of being in a gang.

212.     The District and School Defendants knew that white students had used racial slurs and made racial comments during the winter and spring of 2014 but took no action.  One Colerain High School white student dressed up in black face for Colerain High School football games and then put photos of this up on his Twitter account in the fall of 2013.  Upon

information and belief, no white students were disciplined for such conduct.  Upon information and belief, the District did not conduct any investigation into any of the complaints made by Plaintiffs about such conduct.

213.    Around the time that Plaintiffs were disciplined, Colerain High School white students had posted on social media sites photographs of themselves with numerous toy guns aimed at other people and talking about how many "kills" they had gotten.  Upon information and belief, no white students were disciplined for putting up these images at a time when the school was worried about school safety and gun violence.

214.    Chief Denney, Principal Heintz, and Superintendent Jackson approved the plan to round up and unlawfully search and seize Plaintiffs and other African-American students at Colerain High School on April 10 and to remove them from school for code of conduct violations.  School Defendants carried out the plan along with the Police Defendants.

215.    The District, School, and Police Defendants had no evidence that any of the Plaintiffs had engaged in wrongdoing or criminal conduct when they decided to undertake the April 10, 2014 roundup and seizure of Plaintiffs.

216.    None of the Plaintiffs were charged with any criminal activity related to their removal from school.

**Ongoing Violations of Plaintiffs' Constitutional Rights**

217.    District, School, and Police Defendants continued to target, ostracize, intimidate, and harass the Plaintiffs after their periods of removal from school had ended.  This conduct is ongoing and includes the following events.

218.    District policy permits students to make up missed classwork upon returning to school after a suspension of any length or an expulsion of ten days or less.  However, Plaintiff

E.H.'s teachers refused to give him some of his make-up work when he requested it in violation of this policy.  One teacher stated that there was no reason to give E.H. the work, since E.H. would likely fail the class anyway.

219.    Upon E.H.'s return to school, he was repeatedly and openly criticized by Colerain High School staff.

220.    A white teaching assistant in E.H.'s science class told him to just give up, and later the same teacher confronted him in the hallway and said "what's up Money Gang?"

221.    Upon returning to school, R.S. reported that students, teachers and administrators at the school acted differently toward him.  R.S. reported that he observed Defendant Crowley at his school shortly after his expulsion appeal hearing.  She stared at him but did not speak and then walked away from him.

222.    Shortly after R.S. returned to school from his discipline, R.S.'s mother, Kimberly Sargent, received a phone call from school staff saying that R.S. would be suspended again for being tardy to class too often.  Ms. Sargent asked for the documentation of times R.S. had been tardy.  The school eventually dropped the matter and did not suspend R.S., but the incident made R.S. fearful that he would face additional discipline for things that he did not do.

223.    Upon returning to school, Plaintiff R.S. was told that he would no longer be allowed to use equipment from his digital media classes outside of school hours.  Prior to the discipline, R.S. had been allowed to use the equipment to do homework assignments outside of school hours.

224.    After R.S.'s expulsion appeal and when he was already back in school, Defendant Crowley contacted the P.T.A. member who had hired R.S. to film a school dance recital and

asked questions and made statements that suggested R.S. would no longer be allowed to film District events in the future.

225.    After R.S.'s expulsion, his mother went to the school and asked to view her son's educational records.  She was told that she could not see any of his records because R.S. owed lunch fee for the 2012-2013 school year.  R.S. did not owe any lunch fees for the 2012-13 school year because he received free lunches based on his family's income.  Even if he had owed lunch fees, his mother was still entitled to view her son's educational records under federal law.

226.    Because of the discipline he received for the lawful exercise of his rights under the First Amendment, R.S. has been afraid to continue filming music videos or participate on social media sites.  He has lost interest in his digital media classes and no longer is sure that he will be able to pursue a career in digital media.

227.    Plaintiff T.H. returned to the District's alternative school pursuant to his expulsion appeal decision that held his expulsion in abeyance.  The expulsion appeal decision stated that by attending the alternative school, T.H. would be able to make up work and earn the credits necessary to participate in extracurricular activities in the fall.

228.    The District, however, purposely only enrolled T.H. in four one-credit classes upon admission to the alternative school program although he had been enrolled in six classes while attending Colerain High School.

229.    Upon information and belief, the District did this knowing that Ohio high school sports regulations allow a student to play sports only if the student has attained passing grades in the prior quarter in five one-credit classes.  Regardless of how well T.H. did in his classes at the alternative school, the District guaranteed that he would not be able to play football upon returning to school in the fall of 2014.

38

230.    The District ensured that T.H. would be unaware that he would receive grades in only four classes by initially enrolling him in five classes and then later, without the knowledge of Plaintiff T.H. or his mother, dis-enrolling him from one of the classes.

231.    Upon information and belief, the alternative school routinely allows other students to be enrolled in five or more classes at one time.

232.    Upon information and belief, if T.H. had been enrolled in five or more classes, his grades would have allowed him to be eligible to play sports at Ohio high schools, including at Colerain High School, in the fall of 2014.

233.    Prior to April 10, 2014, Plaintiffs E.H., T.H., and W.P. lifted weights in the school weight room of Colerain High School.  Students are allowed to lift weights regardless of whether they play on any sports teams as it is an open weight room.  District and School Defendants told Plaintiffs and Plaintiffs' friends that Plaintiffs were no longer welcome in the weight room even after their discipline periods were over.  To date, none of the Plaintiffs has been allowed to return to the weight room.

234.    Plaintiffs E.H., T.H., and W.P. had all played football for Colerain High School in the 2013-14 school year.  District and School Defendants have told Plaintiffs E.H., T.H., and W.P. that they are no longer allowed to play football.

235.    Plaintiff T.H. has played football since he was six years old.  By refusing to allow him to play football in his senior year, the District and School Defendants are denying him college scholarship opportunities.

236.    On or about June 17, 2014, Plaintiff T.H. asked Colerain High School head football coach Tom Bolden if he could train with the football team as he had all previous years of his high school career.  Coach Bolden would not allow him to train.  On or about August 1,

2014, Defendant Dan Bolden told T.H. that he would not be able to play football for Colerain during the 2014-15 school year.

237.    Upon information and belief, Colerain High School also removed T.H.'s Hudl account, an online sports activity account viewed by coaches and recruiters looking to offer scholarship opportunities to high school student athletes for college.

238.    On the afternoon of June 28, 2014, Plaintiff E.H. and another African-American minor were visiting a friend in an apartment complex in Colerain Township.  Defendant Officer Doe 1 pulled up beside E.H. and asked him to identify himself.

239.    Defendant Officer Doe 1 frisked E.H. and told E.H. that he would be arrested for trespassing if he were spotted in the complex again.

240.    E.H. had never previously been told that he could not visit friends at the complex and has never been notified of a reason why he is not allowed to be there at this time.  Defendant Officer Doe 1 had no basis for telling E.H. that he could not be present in the complex and knew that he lacked probable cause for arresting him for trespassing.  Defendant Officer Doe 1 made the threat merely to harass E.H.

241.    Later in the evening of June 28, E.H. was visiting the house of a white friend on Lapland Avenue in Colerain Township.  The Colerain Township Police were called to Lapland Avenue that evening to break up a fight in the street involving some unknown individuals. Several officers came to the area.

242.    One of the officers called to the scene was Defendant Officer Doe 1 who had stopped and frisked E.H. earlier that day.  That officer and another Police Officer went down the street to the house where E.H. was and were admitted by a white adolescent female at the home.

243.    Defendant Officer Doe 1 and the other police officer questioned and searched E.H. and the only other African-American male who was in the house.  There were no grounds to justify the search.  The officers did not search any of the white minors at the house.

244.    The officers told E.H. that if they found a weapon when searching him that they would shoot him.  E.H. did not have a weapon.

245.    The officers instructed E.H. to exit the home and sit on the driveway along with the other African-American male.  Defendant Officer Doe 1 told E.H. that if he moved or tried to run he would be shot.  E.H. was terrified he was about to be shot and did not move.

246.    The police officers then interrogated E.H. about his connection to the "Money Gang."  E.H. said that he was not part of that group.

247.    The police officers then instructed E.H. to call his mother to pick him up.

248.    When E.H.'s mother did not answer on the first call, Defendant Officer Doe 1 told E.H. that he would be arrested for a curfew violation if she did not pick up the second time, even though E.H. had been lawfully inside a house until the officers told him to exit it.

249.    E.H.'s mother answered the second call and went to pick up E.H.

250.    When E.H.'s mother arrived, Defendant Officer Doe 1 told her that E.H. was part of the "Money Gang" and that the officers intended to "pin" something on E.H. before the end of the summer.  Defendant Officer Doe 1 told E.H.'s mother that E.H. fit the description of a suspect in a crime that had occurred the previous night in North College Hill.  E.H.'s mother explained that E.H. had been at home watching a younger sibling while she was at the hospital.

251.    On June 30, 2014, Plaintiff T.H. and his friend, another African-American male, walked from the friend's home to the courtyard of T.H.'s apartment complex.

252.   T.H. and his friend used public sidewalks when available for the entirety of their walk except when crossing West Galbraith Avenue, when they used a marked crosswalk.

253.   Approximately ten minutes after T.H. arrived in the courtyard of his apartment complex, a Colerain Police cruiser pulled up near the courtyard.  Defendant Officer Doe 8 exited the cruiser and entered the courtyard and spoke to the boys.  The officer stated that a neighbor had reported that two black males were jaywalking across Cella Avenue.  The Police Officer asked T.H. for identification and then frisked T.H.

254.   After running his identification, the Police Officer asked T.H. if he was associated with the "Money Gang."

255.   The officer then issued a jaywalking citation to T.H.  The citation listed the location of the jaywalking as "8100 Cella Avenue" or "8700 Cella Avenue," an address which does not exist.

256.   Besides T.H. and the friend present with him that day, only one other individual has been cited for jaywalking in Colerain Township in the past year.  That individual was also African-American.

257.   On August 1, 2014, the Hamilton County Juvenile Court dismissed the jaywalking citation against T.H.

258.   On or about July 2, 2014, at approximately 10:15 p.m. E.H.'s mother answered a phone call from the same police officer who had called her to pick up E.H. on June 28, 2014, Defendant Officer Doe 1.  The officer told her he had received a complaint that E.H. was knocking on doors and running away.

259. E.H. was asleep in his house and had been in the house with his mother the entire evening. E.H.'s mother asked the officer if he would like to speak to her son who was in the house asleep. The officer hung up on her.

260. On or about August 8, 2014, T.H. attended the Taste of Colerain with other African-American friends. The Taste of Colerain is sponsored by Colerain Township and takes place on public grounds. It is open to the public.

261. Defendant Officer Meyer, Defendant Officer Doe 9 and Defendant Chief Denney approached T.H. Defendant Officer Meyer then told T.H. that because he was associated with the "Money Gang" he could not be at the Taste of Colerain. Defendant Office Meyer stated that the Taste of Colerain was on private property. Defendant Denney was also present and said that T.H. was on a "list" of people who were not to be allowed at the Taste of Colerain.

262. T.H. obeyed Officer Meyer's instruction to leave even though he knew of no reason why he could not be at the Taste of Colerain. T.H. was humiliated by the incident and believes that he will continue to be harassed by the Colerain Police Defendants while he is engaged in lawful activities.

## Defendants' Actions Caused Plaintiffs' Harm

263. The events of April 10, 2014 and the ongoing constitutional violations by Defendants left Plaintiffs traumatized, fearful that they will be arrested, detained, or removed from school, while only they--and not their non-African-American classmates--have been targeted by the Defendants.

264. Plaintiffs are afraid to associate with one another or with any other African-American student who was targeted on April 10, 2014 for fear that they will be considered to be

in a "gang."  Plaintiffs have limited their associating with other African-American students who have been their friends for years because of the complained-of events.

265.    Plaintiffs are fearful of expressing themselves on social media sites because of the unlawful discipline imposed on them for exercising their constitutionally-protected First Amendment rights.  Plaintiff R.S. has been worried that any photograph he takes or video he shoots might be used against him or his friends unlawfully and has dramatically curtailed his videography and photography hobbies.  Plaintiffs believe that participating with other friends in making music videos outside of school hours may result in further discipline.

266.    Plaintiffs are anxious leaving their homes for fear of being unlawfully detained, searched, arrested, or shot by the police.

267.    Plaintiffs believe that they may be subject to unfair discipline upon returning to school for the 2014-15 school year.  The parents of W.P. requested that he be allowed to attend Northwest High School rather than Colerain High School because of the unlawful acts that occurred on April 10, 2014.  The District has not responded to this request.  Plaintiff R.S. does not know whether he will be allowed to finish his digital media program.  Plaintiff E.H. feels that it is futile for him to continue going to school and wonders if he should just drop out of school.

268.    Plaintiffs believe that school administrators and staff will continue to harass them and will again discipline them for constitutionally protected activities.  Plaintiffs are fearful that other students, teachers, and administrators at Colerain High School will continue to act differently toward them since they were targeted by the District and Police as being in a "gang."

269.    The unlawful actions by Defendants have had devastating and limiting consequences for Plaintiffs, including on their future high school careers, their opportunities to

participate in extracurricular activities, possibilities for attending college, prospects of obtaining sports or academic scholarships, and possibilities for obtaining employment.

270.    Plaintiffs no longer view their high school or the Colerain community as a safe and supportive environment.

## CLAIMS FOR RELIEF

## FIRST CAUSE OF ACTION

**Violation of 42 U.S.C. § 1983**
**(Unlawful Restraint of the Right of Free Expression of the First Amendment)**

271.    Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

272.    In imposing, upholding, and maintaining disciplinary sanctions against Plaintiffs based-in whole or in part- upon their participation in music videos, postings on social media sites, presence in photographs with other African-American youth, and showing of hand signs, the District and School Defendants violated the right to free expression secured to Plaintiffs by the First and Fourteenth Amendments to the United States Constitution.

273.    In imposing, upholding, and maintaining disciplinary sanctions against Plaintiffs based-in whole or in part-upon their participation in music videos, postings on social media sites, presence in photographs with other African-American youth, and showing of hand signs, The District and School Defendants unlawfully discriminated against the speech of Defendants based upon viewpoint.

274.    In imposing, upholding, and maintaining disciplinary sanctions against Plaintiffs, the District and School Defendants relied upon the District Code of Conduct which represents the official policies, practices, and customs of the District and the Board in the area of school discipline.

275.    In failing to train, supervise, discipline, or otherwise restrain from imposing the discipline complained of in this case, the District and School Defendants adopted, sanctioned, ratified, and approved the violation of the First and Fourteenth Amendment rights of Plaintiffs.

276.    Defendants' actions were the result of official policies, practices, and customs of the District and Police Defendants and carried out under the direction of Defendants Jackson and Denney.

277.    Defendants acted wantonly, willfully, maliciously, and with a reckless disregard for the rights of Plaintiffs.

278.    Defendants were acting under color of state law, thereby violating 42 U.S.C. § 1983.

279.    As a direct and proximate result of these actions by Defendants complained of herein, Plaintiffs have suffered and will continue to suffer the harms and damages described above.

**SECOND CAUSE OF ACTION**

**Violation of 42 U.S.C. § 1983**
**(Vague and Overbroad Code of Conduct in Violation of First Amendment)**

280.    Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

281.    The provisions of the District's Student Code of Conduct, including without limitation Sections 102, 105, 143, 155, and 159, are unconstitutionally vague both on their face and as applied to Plaintiffs in that they fail to define with sufficient particularity what activities, including expressive activities and protected speech and association, might subject a student to punishment.

282.    The provisions of the District's Student Code of Conduct, including without limitation Sections 102, 105, 143, 155, and 159, are unconstitutionally overbroad both on their face and as applied to Plaintiffs, in that they proscribe activities and expression wholly protected by the First Amendment to the United States Constitution and proscribe substantially more conduct, expression, and association than necessary to achieve their lawful aims.

283.    The provisions of the District's Student Code of Conduct, including without limitation Sections 102, 105, 143, 155, and 159 have a substantial and unlawful chilling effect on the free speech rights of Plaintiffs.

284.    Plaintiffs will continue to be subject to the provisions of the District's Student Code of Conduct while at Colerain High School.

285.    The past and continued application of the provisions of the District's Student Code of Conduct to Plaintiffs has violated, and continues to violate, their rights under the First Amendment to the United States Constitution.

286.    As a direct and proximate result of these actions by Defendants complained of herein, Plaintiffs have suffered and will continue to suffer the harms and damages described above.

### **THIRD CAUSE OF ACTION**

**Violation of 42 U.S.C. § 1983**
**(Unlawful Restraint of the Right of Association)**

287.    Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

288.    In imposing, upholding, and maintaining disciplinary sanctions against Plaintiffs based in whole or in part upon their association with other African-Americans in photographs, music videos, at school, or in the community, the District and School Defendants violated the

right to association secured to Plaintiffs by the First and Fourteenth Amendments to the United States Constitution.

289.    In detaining, targeting, searching, and interrogating Plaintiffs based in whole or in part upon their association with other African-Americans in photographs, music videos, at school, or in the community, Defendant Officer Does 1-9, Defendant Meyer, and Chief Denney violated the right of association secured to Plaintiffs by the First and Fourteenth Amendments to the United States Constitution.

290.    In failing to train, supervise, or discipline, Defendants Colerain Township, the Board and the District adopted, sanctioned, ratified, and approved the violation of the First and Fourteenth Amendment rights of Plaintiffs.

291.    Defendants' actions were the result of official policies, practices, and customs of the District and Police Defendants and carried out under the direction of Defendants Jackson and Denney.

292.    Defendants acted wantonly, willfully, maliciously, and with a reckless disregard for the rights of Plaintiffs.

293.    Defendants were acting under color of state law, thereby violating 42 U.S.C. § 1983.

294.    As a direct and proximate result of these actions by Defendants complained of herein, Plaintiffs have suffered and will continue to suffer the harms and damages described above.

## FOURTH CAUSE OF ACTION

### Violation of 42 U.S.C. § 1983
### (Discrimination on Account of Race in Violation of the Equal Protection Clause)

295.    Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

296.    Defendants, acting in concert with one another, targeted Plaintiffs in the roundup at Colerain High School on April 10, 2014 because of their race, in violation of the Equal Protection Clause of the Fourteenth Amendment.

297.    The District and School Defendants acted in violation of the District's own policies in disciplining Plaintiffs because of their race in violation of the Equal Protection Clause of the Fourteenth Amendment.

298.    The Police Defendants stopped, searched, and threatened Plaintiffs with arrest because of their race in violation of the Equal Protection Clause of the Fourteenth Amendment.

299.    In failing to train, supervise, or discipline, Defendants Colerain Township, the Board and the District adopted, sanctioned, ratified, and approved the violation of the First and Fourteenth Amendment rights of Plaintiffs.

300.    Defendants' actions were the result of official policies, practices, and customs of the District and Police Defendants and carried out under the direction of Defendants Jackson and Denney.

301.    Defendants acted wantonly, willfully, maliciously, and with a reckless disregard for the rights of Plaintiffs.

302.    Defendants were acting under color of state law, thereby violating 42 U.S.C. § 1983.

303.    As a direct and proximate result of these actions by Defendants complained of herein, Plaintiffs have suffered and will continue to suffer the harms and damages described above.

## FIFTH CAUSE OF ACTION

### Violation of Title VI

304.    Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

305.    Title VI of the Civil Rights Act of 1964 ("Title VI"), 42 U.S.C. § 2000d states that "no person in the United States shall on the ground of race, color, or national origin be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance."

306.    Northwest Local School District's programs and activities receive federal financial assistance.

307.    Plaintiffs have been denied participation in Northwest Local School District's programs by Defendants based upon their race.

308.    School and District Defendants have also retaliated against Plaintiffs for alleging race discrimination and disparate treatment of African-American students in discipline matters in violation of Title VI.

309.    As a direct and proximate result of School and District Defendants' intentional discrimination and retaliation, Plaintiffs have suffered and will continue to suffer the harms and damages described above, and seek relief against District Defendants in their official capacity.

## SIXTH CAUSE OF ACTION

### Violation of 42 U.S.C. § 1985(3)
### (Conspiracy to Violate Civil Rights)

310.    Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

311.    In planning and executing the roundup at Colerain High School on April 10, 2014, District, School, and Police Defendants conspired to target African-American students, without lawful justification, thereby depriving them of their right to equal protection under the law.  Defendants conspired to discipline and punish these African-American students for engaging in constitutionally protected First Amendment rights of free speech and association. Defendants have continued to conspire to violate the civil rights of Plaintiffs by threatening to "pin" criminal charges on them to justify their earlier unlawful acts against Plaintiffs.

312.    In failing to train, supervise, or discipline, Defendants Colerain Township, the Board and the District adopted, sanctioned, ratified, and approved this conspiracy to violate Plaintiffs' constitutional rights.

313.    Defendants' actions were the result of official policies, practices, and customs of the District and Police Defendants and carried out under the direction of Defendants Jackson and Denney.

314.    Defendants acted wantonly, willfully, maliciously, and with a reckless disregard for the rights of Plaintiffs.

315.    Defendants were acting under color of state law, thereby violating 42 U.S.C. § 1983.

316.     As a direct and proximate result of these actions by Defendants complained of herein, Plaintiffs have suffered and will continue to suffer the harms and damages described above.

## SEVENTH CAUSE OF ACTION

**Violation of 42 U.S.C. § 1983**
**(Unlawful Search and Seizure in Violation of the Fourth Amendment)**

317.     Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

318.     Defendants, acting in concert with one another, violated Plaintiffs' right to be free from unreasonable searches and seizures under the Fourth Amendment to the United States Constitution, as applied to the states by the Fourteenth Amendment, during the operation conducted at Colerain High School on April 10, 2014.

319.     Police Defendants violated Plaintiff T.H.'s right to be free from unreasonable searches and seizures under the Fourth Amendment to the United States Constitution, as applied to the states by the Fourteenth Amendment, during the search and arrest of T.H. on June 30, 2014.

320.     Police Defendants violated Plaintiff E.H.'s right to be free from unreasonable searches and seizures under the Fourth Amendment to the United States Constitution, as applied to the states by the Fourteenth Amendment, during the search and seizure of E.H. on June 28, 2014.

321.     In failing to train, supervise, discipline, or otherwise restrain Defendant Doe Officers 1-8, Defendant Bertram, Defendant Sturgeon, Defendant Reynolds, Defendant Bolden, and Defendant Stoinoff, from unlawfully searching and seizing Plaintiffs, Defendant Colerain Township, Defendant District, Defendant Board, Defendant Jackson, Defendant Heintz and

Defendant Denney adopted, sanctioned, ratified, and approved the violation of the Fourth and Fourteenth Amendment rights of Plaintiffs.

322.    Defendants' actions were the result of official policies, practices, and customs of the District and Police Defendants and carried out under the direction of Defendants Jackson and Denney.

323.    Defendants acted wantonly, willfully, maliciously, and with a reckless disregard for the rights of Plaintiffs.

324.    Defendants were acting under color of state law, thereby violating 42 U.S.C. § 1983.

325.    As a direct and proximate result of these actions by Defendants complained of herein, Plaintiffs have suffered and will continue to suffer the harms and damages described above.

## EIGHTH CAUSE OF ACTION

**Violation of 42 U.S.C. 1983**
**(Violation of Due Process Clause of the Fourteenth Amendment)**

326.    Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

327.    District and School Defendants violated Plaintiffs' procedural due process rights guaranteed by the Fourteenth Amendment to the United States Constitution in that, among other things: (A) Defendants failed to give Plaintiffs adequate notice of the school code of conduct violations they were charged with violating; (B) Defendants failed to provide to Plaintiffs and their parents the evidence used in deciding to remove Plaintiffs from school and even refused to allow Plaintiffs access to their own educational records until after the expulsion appeal hearings had concluded; (C) Defendants predetermined that Plaintiffs had violated school code of conduct

regulations prior to meeting with Plaintiffs; (D) Defendants refused to show Plaintiffs' counsel or parents the photographs or music videos that they had obtained from social media sites and were using to expel the students; (E) Defendants failed to allow Plaintiffs to have their parents present with them while school officials in the presence of police officers interrogated them about potentially criminal acts; and (F) Defendants gave false statements under oath about when alleged code of conduct violations occurred in order to give the appearance that the events had recently happened when some events had happened months earlier.

328.    The District and School Defendants' actions in disciplining Plaintiffs violated the District's own policies and were arbitrary, capricious, and illegal, so as to shock the conscience, and they displayed a deliberate indifference to and a conscious disregard of Plaintiffs' constitutional rights, in violation of their substantive due process rights under the United States Constitution.

329.    In failing to train, supervise, or discipline, the Board and the District adopted, sanctioned, ratified, and approved the violation of the due process rights of Plaintiffs.

330.    Defendants' actions were the result of official policies, practices, and customs of the District and Police Defendants and carried out under the direction of Defendants Jackson and Denney.

331.    Defendants acted wantonly, willfully, maliciously, and with a reckless disregard for the rights of Plaintiffs.

332.    Defendants were acting under color of state law, thereby violating 42 U.S.C. § 1983.

333.    As a direct and proximate result of these actions by Defendants complained of herein, Plaintiffs have suffered and will continue to suffer the harms and damages described above.


## REQUEST FOR RELIEF

Plaintiffs respectfully request that this Court grant the following relief:

1.    Declare the acts of Defendants violated the rights of Plaintiffs under the laws of the United States;

2.    Issue an injunction expunging all discipline given to Plaintiffs on April 10, 2014 from the permanent records and transcripts of Plaintiffs;

3.    Issue an injunction prohibiting Defendants from interfering with the Plaintiffs' exercise of their right of free speech and right of association as required by the First Amendment to the United States Constitution;

4.    Issue an injunction prohibiting the different treatment of African-American students from White students by Defendants in imposing discipline;

5.    Issue an injunction prohibiting Defendants, and all those acting in concert with them or acting under their supervision or control, from detaining, searching, seizing the belongings of, interrogating, or sharing information about students at Colerain High School, without probable cause or reasonable suspicion to believe that the student has violated a valid school rule or has violated the law, or based on a student's race.

6.    Issue an injunction requiring the Defendants to provide all information to Plaintiffs gathered by Defendants in the investigation conducted leading up to the April 10, 2014 roundup and discipline;

7.     Issue an injunction requiring the Defendants to destroy any information currently being used by them to monitor the activities of Plaintiffs;

8.     Issue an injunction requiring Defendants to clear Plaintiffs of any wrongdoing in connection with the April 10, 2014 roundup before any entities with whom Defendants have shared information about the Plaintiffs, including with other law enforcement agencies;

9.     Issue an injunction requiring the Defendants to correct all Plaintiffs' academic records to reflect the grades that Plaintiffs had prior to April 10, 2014 as their final third quarter and fourth quarter grades and to provide credit for the grades;

10.     Issue an injunction requiring Defendants to allow Plaintiffs to participate in extracurricular activities;

11.     Issue an injunction prohibiting the discipline of Plaintiffs from school without being provided with the evidence that is being used against them and an expulsion hearing before an impartial decision maker;

12.     Declare the Northwest Local School District's Code of Conduct to be unconstitutionally broad and vague both on its face and as applied to Plaintiffs;

13.     Award Plaintiffs compensatory damages;

14.     Award Plaintiffs punitive damages;

15.     Award Plaintiffs reasonable attorneys' fees and costs pursuant to 42 U.S.C 1988 and 3613(c)(2); and

16.     Award Plaintiffs such further relief as justice may require.

Respectfully submitted,

/s/ Robert B. Newman
Robert B. Newman
Attorney for Plaintiffs
NEWMAN & MEEKS
215 E. Ninth Street, Suite 650
Cincinnati, Ohio 45202
Phone: (513)639-7000
Email: robertnewman@newman-meeks.com

/s/ Elaine Fink
Elaine Fink
Stephanie Moes
Attorneys for Plaintiffs
Legal Aid Society of Southwest Ohio, LLC
215 E. Ninth Street, Suite 500
Cincinnati, OH 45202
Phone: (513) 362-2807; Fax: (513) 241-1187
Email: smoes@lascinti.org

/s/ Donita Parrish
Donita Parrish
Virginia Tallent
Attorneys for Plaintiffs
Legal Aid Society of Greater Cincinnati
215 E. Ninth Street, Suite 200
Cincinnati, OH 45202
Phone: (513) 241-9400; Fax: (513) 241-1187
Email: dparrish@lascinti.org

**JURY DEMAND**

Plaintiffs hereby demand that all issues of fact in the foregoing Complaint be tried by a jury.

/s/ Robert B. Newman
Robert B. Newman
Attorney for Plaintiffs